## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JASON LEOPOLD,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No.  14-1056 (JEB)** |
| **CENTRAL INTELLIGENCE AGENCY,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

Like a multigenerational soap opera, the persistent controversy swirling around the

Central Intelligence Agency's rendition, detention, and interrogation program has now spanned

two presidential administrations, numerous congressional sessions, and the comings and goings

of six CIA directors.  In one of its most recent episodes, the CIA, after finding itself in the

binocular crosshairs of the Senate Select Committee on Intelligence, allegedly flipped the lenses

around to spy back on its Congressional overseers.  When word spread that CIA officials had

purportedly hacked into SSCI's computers – computers the CIA had lent SSCI at a secure CIA

facility – interested ears perked up.  Journalist Jason Leopold and academic Ryan Shapiro filed a

Freedom of Information Act request in the hope of getting the scoop on this latest installment.

After waiting two months without receiving a substantive response from the agency, Plaintiffs

filed this suit to compel one.  Once the matter was in litigation, the CIA released some

documents to Plaintiffs and filed a Motion for Summary Judgment, arguing that it had fulfilled

its obligations under FOIA.  Plaintiffs oppose, arguing only that the CIA's search was

inadequate.  The Court sides with the agency, concluding that it has satisfactorily performed

what the statute demands.

## I.      Background

This dispute, like most FOIA cases, begins with a request for documents.  On April 12, 2014, Plaintiffs Leopold and Shapiro sent a FOIA request to the CIA listing five distinct categories of information.  See Compl., ¶¶ 1-2, 16.  Their central focus was a congressional inquiry into the CIA's alleged torture program conducted by the Senate Select Committee on Intelligence.  See id., ¶ 16.  According to Plaintiffs, as part of that inquiry, the "CIA and SSCI reached an agreement which would permit SSCI staffers to review CIA documents at a secure CIA facility in Virginia.  A written agreement or series of agreements specified the parameters regarding the staffers' access to CIA documents."  MSJ, Attach. 1 (Declaration of Mary E. Wilson), Exh. B (FOIA Request) at 2.  After getting the logistics nailed down, a disagreement arose between SSCI and the CIA.  The agency believed that SSCI staffers had illegally removed internal CIA documents from the secure facility – most specifically, a document or series of documents referred to as the "Panetta Review."  Id.  SSCI, for its part, believed that the CIA had accessed, without authorization, the computers its staffers had been provided.  See id.

To shed more light on this situation, Plaintiffs requested five broad categories of records, consisting essentially of: (1) "written agreements and correspondence" between SSCI and the CIA regarding the former's access to CIA facilities and documents; (2) "records documenting any CIA investigation into the search of SSCI's computers at the secure facility in Virginia," including any referrals or other communications between the CIA and the Justice Department; (3) records related to CIA and DOJ investigations into SSCI's alleged removal of the "Panetta Review"; (4) material pertaining to a CIA contract that had purportedly been awarded to a company to "review[] records relating to the CIA's former Detention and Interrogation

Program"; and (5) "talking points," in both draft and final form, touching on this dispute between the CIA and SSCI.  See Compl., ¶ 16.

Having received no substantive response after two months had passed, in June 2014, Plaintiffs filed suit, asking this Court to "[o]rder Defendant to process the requested records without further delay and release all nonexempt portions" of those records.  See Compl. at 6. Over the ensuing year, Defendant completed the search and began determining whether the documents it had turned up were responsive to Plaintiffs' request.  See Minute Order of Jan. 7, 2015; ECF Nos. 13 (CIA Status Report of 2/24/15), 14 (CIA Status Report of 4/9/15), 15 (CIA Status Report of 5/26/15).  On July 20, 2015, it produced 82 documents (12 released in full, 70 in part) and prepared a preliminary Vaughn Index indicating which FOIA exemptions it had relied on in withholding in full the remaining 231 responsive documents.  See ECF No. 17 (CIA Status Report of 7/16/15); Minute Order of Aug. 19, 2015; Wilson Decl., ¶ 7.  The CIA then filed its Motion for Summary Judgment, arguing that it had met all of its obligations under FOIA. Plaintiffs limited their Opposition to contesting only the adequacy of the agency's search efforts. In addressing the CIA's Motion, therefore, the Court will focus exclusively on that narrow issue.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477

U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011).  In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).  Such affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted).  "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

### III.    Analysis

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted). The statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). Consistent with this statutory mandate, federal courts have jurisdiction to order the production of records that an agency improperly withholds. See 5 U.S.C. § 552(a)(4)(B); Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989).

"Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" Reporters Comm., 489 U.S. at 755 (quoting 5 U.S.C. § 552(a)(4)(B)). "At all times courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure' . . . ." Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Dep't of State v. Ray, 502 U.S. 164, 173 (1991)).

Although the CIA's Motion justifies both the adequacy of its search and the exemptions it relied on in withholding various documents, Plaintiffs dispute only the former point. The Court first discusses the legal standard governing the adequacy of searches and articulates the agency's

justification for the conduct of its search.  It thereafter examines in sequence Plaintiffs' objections to the thoroughness of the search.

    A.  <u>Standard and Explanation of Search</u>

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  <u>Valencia-Lucena v. Coast Guard</u>, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting <u>Truitt v. Dep't of State</u>, 897 F.2d 540, 542 (D.C. Cir. 1990)); <u>see also</u> <u>Steinberg v. Dep't of Justice</u>, 23 F.3d 548, 551 (D.C. Cir. 1994).  "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the <u>search</u> for those documents was <u>adequate</u>."  <u>Weisberg v. Dep't of Justice</u>, 745 F.2d 1476, 1485 (D.C. Cir. 1984).

The adequacy of an agency's search for documents requested under FOIA "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case."  <u>Id.</u>  To meet its burden, the agency may submit affidavits or declarations that explain the scope and method of its search "in reasonable detail."  <u>Perry v. Block</u>, 684 F.2d 121, 127 (D.C. Cir. 1982).  The affidavits or declarations should "set[] forth the search terms and the type of search performed, and aver[] that all files likely to contain responsive materials (if such records exist) were searched."  <u>Oglesby v. Dep't of Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990).  Without contrary evidence, such affidavits or declarations are sufficient to show that an agency complied with FOIA.  <u>See id.</u>  On the other hand, if the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper."  <u>Truitt</u>, 897 F.2d at 542.

In this case, Defendant attached to its Motion a declaration from Mary E. Wilson, who, as of November 2015, served as the CIA's acting "Information Review Officer."  Wilson Decl., ¶ 1.  In it, she described the approach that the agency took in preparing and carrying out its search for

material responsive to Plaintiffs' five-part request.  The first step consisted of "consult[ing] with Agency officials knowledgeable about th[e] [sought-after] subject matter to ascertain the universe of responsive records and to identify the specific offices and individuals who would possess [them]."  Id., ¶ 9.

Based on those consultations, the agency turned its attention to specific offices where "it [was] reasonably likely that responsive records would reside."  Id., ¶ 10.  For four of the five categories of documents – excluding those pertaining to the CIA contract – the agency determined that eight specific offices "would be the locations that would maintain" responsive records.  See id., ¶ 9.  The offices included the Office of the Director (which also includes the Offices of the Deputy Director and Executive Director), the Office of Public Affairs, the Office of Congressional Affairs, the Office of General Counsel, the Office of the Inspector General, and the Office of Security.  Id.  For the contract-related material, the CIA concluded that a search of the "office involved with procuring the contract" would contain such documents.  Id.  The agency included both paper and electronic records in carrying out its search.  Id., ¶ 10.

In addition to the office-specific searches, "CIA personnel conducted searches of records maintained by certain individuals who were identified as possibly possessing responsive documents."  Id., ¶ 9.  The individual-records search likewise covered both paper and electronic material.  Id., ¶ 10.

The agency relied on a set of non-exclusive search terms "calculated to locate [responsive] documents."  Id.  The terms included: SSCI review, SSCI staff, unauthorized search, unauthorized access, RDINet, Firewall, Panetta review, and WCR.  See id.  (To assist the reader, "RDINet" refers to the Rendition and Interrogation Network, which "was the system used by SSCI staffers when conducting their review," id. n.5; "WCR" is the "internal Agency

reference for the draft documents that the plaintiffs call the 'Panetta review.'" Id. n.6)  In

addition, because the events forming the basis for Plaintiffs' request had only recently occurred,

CIA officers charged with executing the search "also relied on the assistance of knowledgeable

officials to locate collections of potentially responsive records held by offices and individuals."

Id.

In sum, the CIA asserts that its personnel conducted a reasonable search for responsive

records, examining the files likely to contain responsive material.  See MSJ at 8.  Plaintiffs

disagree, however, identifying a series of discrete flaws they believe render Defendant's search

insufficient under FOIA.  The Court addresses each of their six specific arguments below.

B.  Plaintiffs' Objections

1.  *Narrow Interpretation of Search Request*

Plaintiffs' first objection is that "the CIA interpreted portions of Plaintiffs' five-part

request too narrowly."  Opp. at 3.  They home in on what they see as discrepancies between the

precise language of their FOIA request and the Wilson declaration's description of the agency's

search.  As an example, the first part of their request seeks "all written agreements and

correspondence" between SSCI and the CIA, see FOIA Request at 2, whereas the Wilson

declaration appears to omit "written agreements" in describing its search effort.  See Wilson

Decl., ¶ 9 ("As outlined above, plaintiffs requested five separate categories of records, *i.e.*, (1)

correspondence between the CIA and SSCI . . . .").  Plaintiffs acknowledge that elsewhere in the

declaration, Wilson recites the language of their request *verbatim*, see Wilson Decl., ¶ 6, but read

the sentence from paragraph 9 as revealing the CIA's decision to "interpret[] Plaintiffs' FOIA

request as applying only to 'correspondence . . .'"  Opp. at 3-4.

They also believe that Wilson's abbreviated summary in paragraph 9 relating to parts 2 and 3 of Plaintiffs' request evinces a similar effort by the agency to improperly cabin what they are seeking.  See id. at 4.  It is true that in her declaration, Wilson summarizes those parts of the request by stating that "plaintiffs requested five separate categories of records, . . . [including] (2) the CIA and DOJ investigations into the search of SSCI computers; [and] (3) the CIA and DOJ investigations into the removal of documents referred to as the 'Panetta Review.'"  Wilson Decl., ¶ 9.  This differs from those segments of Plaintiffs' actual request, which also asked for documents exchanged between CIA and SSCI.  Compare FOIA Request at 2 (seeking, for example, "correspondence between the SSCI . . . and the CIA" regarding the events in question).

The Court finds these insinuations of purposeful omissions to manifest unreasonable suspicion on Plaintiffs' part.  The declaration, read in context, simply evinces Wilson's attempt to provide a condensed summary (in paragraph 9) of a lengthy FOIA request, which was properly excerpted in full in an earlier part of the document (in paragraph 4).  While she may well have sacrificed precision for the sake of brevity – particularly since she had already recited the full request – this is hardly a nefarious act.  Rather than penalize Wilson's concision, the Court would encourage more litigants to abide by Orwell's adage that "[i]f it is possible to cut a word out, always cut it out."  George Orwell, *Politics and the English Language*, in 4 The Collected Essays, Journalism and Letters of George Orwell 139 (Sonia Orwell & Ian Angus eds., 1968).

To the extent Plaintiffs harbor any lingering misgivings about Defendant's intentions, moreover, the agency furnished a supplemental declaration to make clear that it did not narrow Plaintiffs' request.  It states:

> In [the relevant] section of the [Wilson] declaration, the CIA
> attempted to summarize plaintiffs' request to serve as a shorthand

> reference for the reader.  Any omissions in the summary were
> inadvertent and did not indicate a narrowing or interpretation of
> plaintiffs' original request.  Rather, the CIA searched for all the
> documents listed in plaintiffs' request . . . .

Reply, Attach. 1 (Declaration of Antoinette B. Shiner), ¶ 5.  Plaintiff has not opposed the filing

of this supplemental declaration, and even though the Court finds this additional explanation to

be superfluous, it clearly cures any doubt about whether the CIA impermissibly narrowed its

search.

### 2.   *Distinguishing Responsive from Non-Responsive Records*

The next objection relates to how the CIA distinguished between those documents it

deemed responsive and those that it initially found "potentially" responsive but ultimately

determined were not.  As the CIA explained in its initial declaration, because Plaintiffs sought

information relating to temporally recent events, the agency took a two-pronged approach to

uncover responsive records.  The first involved a standard search of offices and individual

personnel files and databases (both hard copy and electronic) likely to contain records.  See

Wilson Decl., ¶¶ 9-10.  To ensure it did not miss any recent materials, however, it also "relied on

the assistance of knowledgeable officials to locate collections of potentially responsive records

held by offices and individuals." Id., ¶ 10.  From these parallel paths, the agency "uncovered a

large volume of duplicative documents and non-responsive records" in addition to the responsive

ones.  Id.  After reviewing that broader pool of material to exclude duplicative and non-

responsive material, it then proceeded to determine whether the remaining responsive documents

were exempt from disclosure under FOIA.  See id., ¶¶ 10-36.

Plaintiffs attack the agency's non-responsiveness determinations as insufficiently

explained, asserting that "the record contains no evidence of how the CIA determined which

records were non-responsive."  Opp. at 4.  That statement is somewhat off the mark because the

agency implicitly did shed light on what it considered to be <u>non-responsive</u> by defining the

parameters it used to uncover <u>responsive</u> material.  <u>See id.</u>, ¶¶ 9-10.  Regardless, the CIA in its

supplemental declaration explained that it

> used a plain reading of the request to make its responsiveness calls.
> Because the[] search terms were so general in nature [*e.g.*,
> unauthorized search, unauthorized access, firewall], many of the
> documents retrieved contained one or more of the search terms, but
> clearly did not relate to the five items requested by Plaintiffs.  As a
> result, the Agency determined that this material was non-responsive
> and excluded it from the litigation.

Shiner Decl., ¶ 12.  Or, to state it more clearly, if, upon closer inspection by CIA personnel, the

document was "clearly" irrelevant to the request, it was deemed "non-responsive."

Using the "guiding principle of reasonableness" to gauge the search's adequacy, <u>see</u>

<u>Weisberg</u>, 745 F.2d at 1485, the agency's description of its document-by-document, common-

sense approach to distinguishing responsive from non-responsive documents was proper and

described in sufficient detail, particularly given the contrast between the narrow focus of the

request and the breadth of certain search terms.  <u>See</u> <u>Hall & Assocs. v. EPA</u>, 14 F. Supp. 3d 1, 7

(D.D.C. 2014) ("human-centered approach" to "review[ing] . . . potentially responsive

documents to determine whether they were in fact responsive" was "entirely proper" under

FOIA).  After all, "[r]equiring a description of <u>how</u> the [search personnel] searched [the targeted]

files so that plaintiffs can scrutinize all aspects of the [agency's] efforts would run afoul of the

principle that courts confronted with FOIA requests should not 'attempt to micro manage the

executive branch.'"  <u>Nat'l Immigration Project of the Nat. Lawyers Guild v. U.S. Dep't of</u>

<u>Homeland Sec.</u>, No. 11-3235, 2012 WL 6809301, at *7 (S.D.N.Y. Dec. 27, 2012) (emphasis

added) (quoting <u>Johnson v. Exec. Office for U.S. Attorneys</u>, 310 F.3d 771, 776 (D.C. Cir.

2002)); <u>see also</u> <u>Competitive Enter. Inst. v. EPA</u>, 12 F. Supp. 3d 100, 114 (D.D.C. 2014)

(concluding that even though agency "out of an abundance of caution that borders on confusion,
included non-responsive documents" on Vaughn Index, agency "was not required to release
them nor further justify their withholding").

   Plaintiffs nevertheless insist that they "must be provided with an opportunity to challenge
[the] agency's determination of non-responsiveness." Opp. at 4.  In so arguing, they cite two
cases from the Northern District of California that they believe stand for such a proposition –
namely, Dunaway v. Webster, 519 F. Supp. 1059 (N.D. Cal. 1981), and ACLU v. FBI, No. 12-
3728, 2013 WL 3346845 (N.D. Cal. July 1, 2013).  Neither of those non-binding cases, however,
provides that a plaintiff is entitled to interject itself into the agency's general responsiveness
determinations, particularly where the agency has offered a full explanation.  In both cases, the
relevant agency disclosed portions but not all of certain documents, redacting other portions and
withholding still others as non-responsive.  See Dunaway, 519 F. Supp. at 1083; ACLU, 2013
WL 3346845, at *11.  In both cases, the court determined it sensible to review the full documents
*in camera* to determine whether the redactions were proper.  See Dunaway, 519 F. Supp. at
1083; ACLU, 2013 WL 3346845, at *11.  At least in Dunaway, the court concluded that the
agency had improperly redacted some information that was at least tangentially responsive and
ordered its release.  See 519 F. Supp. at 1083-84 (ordering release of materials "in those
instances where the court felt that there was any possibility that the material might bear some
relationship to the subject of the request, or if the information was necessary to understand the
context in which the reference to the subject of the request arises in the document").

   In short, both were cases in which certain documents were already before the court, and
the parties were quibbling about the scope of certain redactions.  That is not the case here, and
with no suggestion that the agency improperly carried out its responsiveness determinations, the

Court is unwilling to require further and more detailed explanations on this front.  See Weisberg,

745 F.2d at 1485 ("The adequacy of the search . . . is judged by a standard of

reasonableness . . . ."); cf. Dunaway, 519 F. Supp. at 1064 ("Having waded through this mass of

documents . . . we well understand why courts have generally avoided the quagmire of *in camera*

inspections under the FOIA, particularly where a large number of documents are at issue.").

　　　　3.　*Duplicate Records*

　　　　Plaintiffs also take issue with the CIA's assertion that it withheld "duplicate" records.

See Opp. at 5; Wilson Decl., ¶ 10 ("[D]uplicative documents . . . . [were] excluded from the

ligitation.").  Such withholding was improper, they claim, because their FOIA request

specifically asked for "duplicate" records.  See FOIA Request at 7 ("Requesters request

disclosure of any and all supposedly 'duplicate' pages.").  As they explain it: "Scholars analyze

records not only for the information available on any given page, but also for the relationships

between that information and information on pages surrounding it."  Id.  But the government's

obligations under FOIA are "satisfied when an agency produces the requested pages."  Jett v.

FBI, No. 14-276, 2015 WL 5921898, at *8 (D.D.C. Sept. 30, 2015); see Crooker v. U.S. State

Dep't, 628 F.2d 9, 10 (D.C. Cir. 1980) (*per curiam*) ("[FOIA] does not require that the agency

from which documents are requested must release copies of those documents when another

agency possessing the same material has already done so.").  While this does not mean that

where there are similar but not identical documents, the government may choose which one to

produce, "it would be illogical and wasteful to require an agency to produce multiple copies of

the exact same document."  Defenders of Wildlife v. U.S. Dep't of the Interior, 314 F. Supp. 2d

1, 10 (D.D.C. 2004).  The Court will not so require here.

4.   *Inadequate Description of Search*

Plaintiffs next argue that "[t]he CIA's [declaration] does not sufficiently describe the search conducted."  Opp. at 5.  They take aim at what they believe are several critical shortcomings.  First is a lack of detail on who carried out the search.  Second is a failure to explain which "records systems" the CIA searched and why it might have searched some but not others.  Third is insufficient information pertaining to the manner in which the CIA carried out its search.  The Court will treat each objection in turn.

As a reminder, to meet its burden of establishing that the search was "reasonably calculated to uncover all relevant documents," Valencia-Lucena, 180 F.3d at 325 (internal citation and quotation marks omitted), the agency may submit a declaration explaining the scope and method of its search "in reasonable detail."  Perry, 684 F.2d at 127.  That includes "set[ting] forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched . . . ."  Oglesby, 920 F.2d at 68.  Such a declaration will suffice to meet the agency's burden unless there is contrary record evidence raising a doubt that the search was adequate.  See Truitt, 897 F.2d at 542.

*i.*   Search Personnel

Although the Court is unsure why the identity of the personnel executing the search is of any use to Plaintiffs, they nevertheless complain that the CIA erroneously declined to broadly identify those individuals.  See Opp. at 6 & n.3 ("Names are not necessary.  Rather, the CIA should describe the nature of the personnel.").  The agency has remedied any such deficiency by explaining in its supplemental declaration that personnel from within the agency's "Information Management Services" unit conducted the search.  See Shiner Decl., ¶ 6.  The CIA continues: "[IMS is] a component within the CIA that serves as the reception point for all FOIA requests . . . .   [Its] professionals are experienced with the records holdings of particular offices

and the methods for retrieving responsive documents from those systems." Id.  Having generally identified the searching parties and described, as Plaintiffs requested, the "nature of the personnel" carrying out the search, any objection on this point now appears moot.

### ii. Records Systems Searched

Plaintiffs' next gripe is with the CIA's purported failure to specify which "records systems" it searched.  This particularly raises their hackles because they included in their FOIA request an illustrative set of records systems that they believed were likely to contain responsive documents.  See FOIA Request at 2 (asking CIA to search, inter alia, Congressional Liaison Records, Office of the Director Action Center Records, Inspector General Research Records, Inspector General Investigation and Review Records, etc.).  Although the FOIA request does not so indicate, the listed records systems appear to be drawn from the CIA's compilation of its "Privacy Act systems of records," which was published in the federal register as part of the agency's obligations under that statute.  See Privacy Act of 1974; Systems of Records and Routine Uses, 70 Fed. Reg. 29832, 29832 (May 24, 2005).

In describing its search efforts, however, the CIA did not indicate that it had searched any of those "systems of records" highlighted by Plaintiffs.  Instead, the agency stated that

> the searches included all relevant databases, Agency share drives, and archival records which contained tasking information, correspondence, memoranda and other office-specific records sought by plaintiffs.  Those keyword searches, including those set forth in the [Wilson Declaration], were calculated to retrieve from each database and filing system records that contained those terms. In cases where records provided references to additional responsive documents, IMS professionals followed up on those leads and conducted additional searches based on those terms or references. At the conclusion of those searches, IMS professionals determined that there were no additional office databases, files or repositories that were reasonably likely to contain the records requested by plaintiff [sic].

Shiner Decl., ¶ 7.  It also explained why the Privacy Act "systems of records" highlighted by

Plaintiffs were not helpful or relevant in carrying out the search, noting:

> The purpose of [the CIA's systems-of-records notice published in the federal register], *inter alia*, is to identify broad categories of records maintained by CIA that are retrievable by an individual's name or personal identifier and therefore [are] subject to the provisions of the Privacy Act of 1974.

Id., ¶ 14.

Those systems of records thus serve a purpose distinct from identifying databases or

other repositories of information that might contain documents relevant to a given FOIA request.

See id. ("The Privacy Act systems of records are not tantamount to discrete Agency databases

and filing systems that can or should be searched in response to a FOIA request and they have no

bearing on how the CIA designed and executed its searches in the FOIA case.").  The CIA,

moreover, clarified in its supplemental declaration that even though these systems of records "do

not inform FOIA searches, all of the offices that manage the Privacy Act systems of records

referenced by Plaintiff were searched as part of this litigation[.]"  Id., ¶ 14 n.4.

Plaintiffs rejoin that the CIA "may not turn a blind eye to leads identified in the request

which are likely to yield responsive records."  Opp. at 8.  But as the D.C. Circuit has made clear,

"[A] request for an agency to search a particular record system – without more – does not

invariably constitute a 'lead' that an agency must pursue."  Mobley v. CIA, 806 F.3d 568, 582

(D.C. Cir. 2015).  To compel the agency to search a particular system, the "lead" provided "must

be 'both clear and certain' and 'so apparent that the [agency] cannot in good faith fail to pursue

it.'"  Id. (quoting Kowalczyk v. Dep't of Justice, 73 F.3d 386, 389 (D.C. Cir. 1996)).

Plaintiffs have not offered any explanation as to why the specific Privacy Act systems of

records identified in their request constitute leads that, on their face, should have been pursued,

particularly given the agency's assertion that it searched the relevant offices that managed those systems.  Requesters cannot simply demand that an agency carry out the search in the manner they wish by "mere fiat."  Id. (rejecting as contrary to the "reasonableness" standard plaintiff's argument that requester is entitled "to dictate, through search instructions, the scope of an agency's search").  Critical here, too, is that the agency has provided a reasonable explanation for why those purported leads would not assist it in executing its search.  See Shiner Decl., ¶ 14.

> *iii.*   Lack of detail

Plaintiffs' final objection to the CIA's description of its search is that it lacked sufficient detail on three points: (a) which precise search words were used, (b) which search terms were used for each record system searched, and (c) how the "search mechanism" functions on a database-by-database or repository-by-repository basis.

The first issue is a nitpicky one.  Plaintiffs acknowledge that the CIA provided a set of terms that it used in its search, but argue that because the agency qualified that list by using "such as," it obfuscated the search terms it actually used.  See Opp. at 9 ("[I]n using the language 'such as,' the declaration indicates that it is not providing a list of the actual keywords used, merely examples.") (emphasis in original); Wilson Decl., ¶ 10 ("Employees conducted the searches using terms such as 'SSCI review,' 'SSCI staff' . . . ," *etc.*).  As the agency explains in the Shiner declaration, however, "[T]he search terms listed [in the Wilson declaration] . . . and variations of those terms were used in the course of the Agency's searches."  Shiner Decl., ¶ 12 n.3 (emphasis added).  That is enough.

Plaintiffs also argue in their Opposition that the CIA erred by not including "draft review" in its set of search terms because although the media referred to the relevant document as the "Panetta review," Plaintiffs claim that the agency internally used the former term.  See Opp. at 9 (citing this Court's opinion in Leopold v. CIA, 89 F. Supp. 3d 12, 16 (D.D.C. 2015)).

The CIA demonstrates that this assertion is unfounded.  As a preliminary matter, <u>Leopold</u> does

not, in fact, state that the agency used "draft review" as a shorthand for the document Plaintiffs

refer to as the "Panetta review."  <u>See</u> 89 F. Supp. 3d at 16 (describing short-term effort by CIA to

"prepar[e] summaries of certain key information" related to SSCI's review of CIA interrogation

and detention practices, including the preparation of "draft review[s]" by CIA personnel, which

were "inten[ded] . . .to become . . . rough guide[s] to noteworthy information on a particular

topic") (internal quotations and citations omitted).  The declaration submitted to the Court by the

CIA in that case – which Plaintiffs attached to their Opposition – also states quite clearly that

"[w]hat Mr. Leopold calls the 'internal study,' and what press accounts have sometimes called

the 'Panetta Review,' is actually a series of more than forty draft documents relating to the CIA's

former detention and interrogation program."  Opp., Attach. 2 (Declaration of Martha M. Lutz,

filed in <u>Leopold v. CIA</u>, No. 14-48 (Dec. 10, 2014)), ¶ 8.  The declarant in that case, Martha

Lutz, then went on to state: "For convenience, I will refer to them <u>in this declaration</u> as the 'Draft

Reviews,' or simply 'the Reviews.'"  <u>Id.</u>, ¶ 10 (emphasis added).

More to the point, Plaintiffs are not entitled to summary judgment merely because they

might have preferred that the agency use one search term over another.  <u>See, e.g.</u>, <u>Physicians for</u>

<u>Human Rights v. U.S. Dep't of Def.</u>, 675 F. Supp. 2d 149, 163-64 (D.D.C. 2009) (no support

"for the proposition that a FOIA claimant can dictate the search terms to be used as the

benchmark for determining whether an agency's search is reasonable") (citation and internal

quotation marks omitted).  This is all the more relevant here where the agency has gone to great

lengths at the beginning of the search process to ensure that its effort was designed to maximize

responsive results.  <u>See</u> Wilson Decl., ¶ 9 ("In the course of conducting searches for [the

requested material], CIA personnel consulted with Agency officials knowledgeable about this

subject matter to ascertain the universe of responsive records and to identify the specific offices

and individuals who would possess those documents."); id., ¶ 10 ("Given the recency of the

events . . . search professionals also relied on the assistance of knowledgeable officials to locate

collections of potentially responsive records . . . ."). In sum, the Court does not find the search

was inadequate simply because the CIA did not use the search term "draft review."

Plaintiffs also want to know "which records systems were searched using which terms."

Opp. at 4. But the CIA has already provided such information by reaffirming that all of the listed

search terms (and variations on those terms) were employed to carry out the search. They need

not repeat that list ad nauseam in describing each office and record system that they searched.

Last, Plaintiffs assert that the agency fails to adequately describe how each record

system's search function operates, suggesting that they need more detail to determine the

adequacy of the search. See Opp. at 9 ("[A]re the keywords searching an index of documents or

the full-text of documents? Would a search for 'firewall' return a hit for the plural form,

'firewalls'? Were Boolean searches used . . .?"). Plaintiffs point to no case, however, that

demands, as a matter of course, this degree of specificity from an agency declarant. See Citizens

for Responsibility & Ethics in Washington v. Nat'l Indian Gaming Comm'n, 467 F. Supp. 2d 40,

50 (D.D.C. 2006) (rejecting FOIA claimant's demand that agency provide "information

regarding the actual databases or indices searched" and "what Boolean operators (if any) were

used to accomplish the electronic search") (citations and internal quotation marks omitted). And,

like Plaintiffs' other objections, this one is rendered all the more trifling on account of the CIA's

careful ex ante preparations in designing its search in this case. Accord Physicians for Human

Rights, 675 F. Supp. 2d at 164 ("[A]n agency is only held to a standard of reasonableness; as

long as this standard is met, a court need not quibble over every perceived inadequacy in an

agency's response, however slight.").

### 5.   *Failure to Uncover Documents*

Plaintiffs next invoke the oft-used but rarely successful strategy of impugning the

adequacy of the search by identifying certain documents that they claim would have been

produced had the agency proceeded properly.  Plaintiffs first point to the CIA's failure to turn up

"certain letters exchanged between [CIA offices of General Counsel, Congressional Affairs, and

Security] and Sens. Feinstein, Chambliss, and other SSCI members."  Opp. at 10.  In addition to

Plaintiffs' failure to specify what those letters are, they also decline to provide anything beyond a

speculative conclusion that the documents should have been located and produced by the agency

had the search been adequate.  See id. at 10-11 ("On information and belief, these letters were

eventually obtained by SSCI, but were not released to Plaintiffs or cited to in the Vaughn index

in this case.").  Conclusory speculation will not suffice to defeat summary judgment here.

They also point to a number that turns up on one of the documents produced by the

agency – OCA-2014-0065 – and argue that this constitutes a "file" that the agency should have

reviewed because the file "appears to contain correspondence between CIA and SSCI relating to

the RDINet issues that are the subject matter of Plaintiffs' request."  Opp. at 11.  The agency

explains, however, that Plaintiffs have misunderstood the reference to that number, which relates

not to a file, but to a "reference number associated with that particular correspondence . . . ."

Shiner Decl., ¶ 10.  Taking that credible explanation alongside the D.C. Circuit's general

guidance that "a search is not unreasonable simply because it fails to produce all relevant

material," Meeropol v. Meese, 790 F.2d 942, 952-53 (D.C. Cir. 1986), the Court concludes that

Plaintiffs' identification of a reference number on an already-produced document does not an

inadequate search make.  See SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir.

1991) (relevant inquiry is "whether the search was reasonably calculated to discover the

requested documents, not whether it actually uncovered every document extant").

### 6.  *Offices Not Searched*

The final objection Plaintiffs lodge is that the CIA neglected to search a number of

offices or locations that they believe are likely to contain responsive documents.  They argue that

in addition to the eight offices searched, the agency should have dug into files and databases held

by the Offices of the Director of the National Clandestine Service, the Directorate of

Intelligence, the Directorate of Science and Technology, "or" (confusingly, they do not use the

conjunctive "and") the Directorate of Support, as well as the National Clandestine Service

Secretariat File or the "RDI Group's files."  Opp. at 11-12.  These places should have been

searched, they claim, because "[r]ecords released to Plaintiffs in this case contain markings

indicating that the records were distributed to one or more of these offices or files."  Id. at 12.

Leaving aside the question of "markings" for a moment, the CIA has, as a general matter,

amply demonstrated that the scope of its search was reasonably calculated to locate responsive

material.  It did precisely what a responsible agency should do when faced with this type of

FOIA request, which is to first "consult[] with Agency officials knowledgeable about th[e]

subject matter to ascertain the universe of responsive records and to identify the specific offices

and individuals who would possess those documents."  Wilson Decl., ¶ 9.  In conducting that

assessment, the CIA concluded that because the "Directorate of Operations, the Directorate of

Science and Technology, [and] the Directorate of Analysis . . . were not involved with the SSCI

review process, the OIG or Department of Justice investigations or other aspects of plaintiffs'

request," those offices were not likely to contain responsive records.  See Shiner Decl., ¶ 9.  In

other words, the search personnel did not simply embark on the task without either a sextant or a charted path to the final destination.  Their course was appropriate and resulted in a search of "all locations in which it is reasonably likely that responsive records would reside . . . ."  Wilson Decl., ¶ 10.

In addition, even though Plaintiffs argue that the CIA should have searched the "Directorate of Support," its declarations make clear that it did search records held by that office when it searched the "Office of Security, which is part of the Directorate of Support."  Id., ¶ 9 n.1.  The agency deemed that sub-office to be the one most likely to contain potentially responsive records, and the Court agrees that it was not required to conduct a search of the entire office, having already "determined that other parts of that directorate were not reasonably likely to maintain [responsive] material."  Id.

The next question is whether the "markings" Plaintiffs claim to have identified on some of the records they obtained from the CIA should have served as a lead that required the agency to expand its search.  In making this argument, Plaintiffs attached four exhibits to their Opposition as evidence that certain records had "markings" indicating that they "were distributed to one or more" of the offices or files noted above.  See Opp. at 12.  Only one of those documents, however, was distributed to any of the offices Plaintiffs maintain should have been searched but were not.  That document is a letter designating the office of the Executive Director as the "lead for all matters pertaining to the recent discovery of privileged Central Intelligence Agency documents on a section of . . . local area network being used by the staff of the Senate Select Committee on Intelligence conducting the investigation into the former CIA Rendition, Interrogation and Detention program."  Opp., Exh. A (Jan. 23, 2014, Memorandum of John Brennan) at 1.

As the document itself explains, however, in so designating the Executive Director as the "lead" on this matter, it empowered that office to "call upon any component of the Agency to provide you with personnel or resources as you deem necessary." Id.  In other words, the letter "received a wider distribution" than the offices searched by the CIA here because it was notifying a broad set of agency offices that they might be called upon for assistance by the Executive Director if it was necessary.  See Shiner Decl., ¶ 10.  The CIA further explains that the "memorandum is unique" in that regard, meaning that its existence did not "impact the search strategies used by the IMS professionals to uncover responsive records." Id.  The Court finds this explanation sufficient to justify the CIA's decision not to search those other offices, particularly given that the letter is the only evidence Plaintiffs offer to suggest that the search was too narrow as to the specific offices searched.  See Kowalczyk, 73 F.3d at 389 (lead must be "both clear and certain" and "so apparent that the [agency] cannot in good faith fail to pursue it").

Plaintiffs also believe that because certain produced documents were also marked as distributed to "RDI," the "RDI Group's files" should also have been searched.  See Opp. at 11-12.  (RDI refers to rendition and interrogation, see Wilson Decl., ¶ 10 n.5, although the agency calls what Plaintiffs refer to as the "RDI Group" the "Director's Review Group."  See Reply at 11.)  The CIA explains that it did search those files "as part of the broader Director's area search," and that the search of those files yielded some responsive documents that were either produced or are withheld and listed in the Vaughn Index.  See Shiner Decl., ¶ 10; Reply at 11.  That is sufficient.

**IV.      Conclusion**

In sum, Plaintiffs' objections, though numerous, are insufficient to defeat the CIA's showing that it carried out the search in a manner reasonably calculated to locate documents responsive to the initial FOIA request.  For these reasons, the Motion for Summary Judgment will be granted.  A separate Order so stating will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge


Date:   April 8, 2016